SCHMIDT-BLAKELY COAL COMPANY *v.* HEMBREE.

Opinion delivered May 27, 1918.

1. CONTRACTS—FORFEITURE AND CANCELLATION—WAIVER.—A lease of coal land provided for a forfeiture of the lease if the land leased was not worked persistently. *Held,* a lapse of five years in which the lessee failed to prosecute work on the mine, constituted an

abandonment of the lease. Equity will cancel the lease where it has been abandoned, but equity will not enforce a forfeiture clause where the forfeiture has been waived.

2. CONTRACTS—WAIVER OF FORFEITURE.—Where a lease of coal lands had been abandoned by the lessee, the lease contract providing for a forfeiture in case of abandonment, the lessor can not enforce the forfeiture, where the lessor was induced to resume work and place additional valuable machinery upon the premises, by reason of a letter written him by the lessor, treating the lease as still in existence.

3. CONTRACTS—JOINT LEASE OF COAL LANDS—WAIVER OF FORFEITURE.— A. and B. executed to C. a joint lease of separate coal lands. C. forfeited the lease under its terms by abandonment. *Held*, B. was bound by a letter written to C. by A. waiving the forfeiture, under which C. resumed work.

Appeal from Franklin Chancery Court, Ozark District; *W. A. Falconer,* Chancellor; reversed.

*Winchester & Martin,* for appellant.

There has been no breach of the lease, but if so, it was waived by appellees. It was error to cancel the lease. 16 Cyc. 44; 25 So. Rep. 834; 133 U. S. 156; 6 Cyc. 336; 146 Mass. 399. See also 59 Ark. 408; 77 *Id.* 305; 52 *Id.* 207; 69 *Id.* 513; 78 *Id.* 202; 77 *Id.* 168; 98 *Id.* 328; 91 *Id.* 133; 101 *Id.* 461; 102 *Id.* 442; 96 U. S. 242; 1 Pom. Eq. Jur. (3 ed.), § § 459-460.

*E. L. Matlock,* for appellees.

Appellant failed to perform its contract, and thereby terminated the lease. In fact, the evidence shows an abandonment of the contract. The findings of the chancellor are sustained by the evidence that there was a breach of the lease working a forfeiture, and no waiver is shown. 97 Ark. 167; 114 *Id.* 419.

Lack of money with which to purchase and provide necessary machinery and equipment does not relieve appellant of responsibility. 130 Ark. 9. Bad faith and mismanagement were shown. No insuperable obstacles were shown, and the company is insolvent. No new contract was ever made and no waiver proven.

HUMPHREYS, J. Appellees instituted suit against appellants in the Franklin Chancery Court to cancel a

coal mining lease on the east half, northeast quarter, section 36, township 9 north, range 26 west, in Franklin County, Arkansas, executed on the 11th day of March, 1908, by H. L. Hembree and his wife and Walter O'Kane and his wife, on the one part, and Schmidt-Blakely Coal Company on the other part for the alleged failure to operate the mine in accordance with the contract, and the assignment thereof contrary to the provisions of the contract.

Appellants denied the material allegations of the complaint, and, by way of further defense, pleaded that if they breached any covenant or covenants in the contract, the forfeiture thereunder was waived by appellees.

The cause was submitted upon the pleadings and oral evidence and a decree rendered canceling the lease, from which decree an appeal has been prosecuted to this court.

The contract contained a clause prohibiting the assignment of the lease without the consent of appellees, but the contention by appellees for a forfeiture under that clause has been eliminated for failure of proof to sustain that allegation in the complaint.

The lease was for a term of twenty-five years, and the clauses in the lease furnishing the basis for the suit are as follows:

"1.   It is agreed that work shall be commenced under this contract within ten months from date hereof, and provided further that until coal is reached or for the first eight months the party of the second part shall pay to the parties of the first part as advance royalties the sum of one hundred ($100) dollars per month and for the remaining two months if coal has not been reached the party of the second part agrees to pay to the parties of the first part the sum of two hundred ($200) dollars per month as advance royalties, said payments to be made on or before the 15th day of each month, for the preceding month; and provided further that when coal is reached that the party of the second part shall have credit at the rate of twenty-five dollars per month if the royalties

shall amount to this sum, until such sums as have been paid as advance royalties shall have been repaid and in the event said parties of the second part shall not have reached coal at the end of ten months from date hereof they shall forfeit to the parties of the first part all royalties so paid.''

''2.   The parties of the second part agree to prosecute the work with vigor and due diligence to completion unless prevented by strikes, lockouts, scarcity of cars, accidents or some cause beyond the control of the parties of the second part, and said mines when opened to be operated continuously unless the condition of the market would not justify same to be operated at a profit.''

''3.   It is further agreed by both parties to this contract or lease that failure upon the part of either to comply (with) its provisions terminates the contract.''

At the time the lease was executed, appellant, Schmidt-Blakely Coal Company, had a lease on twenty acres of coal land called the Stovall land, just north of the Hembree land.   An entry had been driven on the Stovall land in the direction of the Hembree land, some 900 feet, and, in order to reach coal on the Hembree land, it was necessary to continue the entry some 420 feet. Under the terms of the lease it was in contemplation of the parties to reach coal on the Hembree land within ten months.   The coal not having been reached at the expiration of that period, appellees extended the time.   The extension appears in the form of a letter written from Altus to the Schmidt-Blakely Coal Company, of date December 25, 1909.   Omitting the caption, the letter is as follows:

''Gentlemen:   Mr. Schmidt was up to see us in regard to our reducing monthly payment on royalty.   We have decided we would allow you all the time you need in which to reach the coal, but can not reduce the royalty; in other words, we'll allow the contract to stand just as it is but give you more time in which to reach the coal—we therefore will expect at once the payment of the

two months past due or we will consider the contract or lease nullified.   Yours truly,

"H. L. Hembree."

(1)   The payment of advance royalties was continued until the fall of 1911, when $4,775 had been paid, at which time the Hembree and O'Kane coal was reached. Appellees were notified that the coal had been reached and the only royalties advanced after that time were for sums which were due prior to the notification.   It seems that back royalties were paid in January, 1912, and a balance of $25 paid to Mrs. Hembree in December, 1913. These advance royalties were all accepted by appellees and the contract treated in full force and effect by all the parties as late as the fall of 1911.   No coal has ever been mined on the Hembree-O'Kane land and the excuses offered by appellants for not developing and working the mine were floods, strikes and depreciation in value of coal below economical cost of production.   There is much evidence in the record tending to show that appellant company met with interferences of this character; but there was much evidence tending to show that appellant company had leased other lands adjoining the Stovall land which offered better and less expensive opportunities for mining and which were mined by said company at intervals between 1911 and the fall of 1916, when this suit was instituted.   The evidence on the point is so voluminous that it is entirely impractical to set out a summary thereof in this opinion.   Suffice it to say that we have carefully read the evidence and think the great weight thereof is to the effect that appellant company, prior to June 27, 1916, breached the covenant in the contract requiring that the coal mine, when opened, be operated continuously and with vigor and due diligence.   After appellant company ceased to pay royalties in the fall of 1911, it made no *bona fide* effort to mine the coal under the Hembree land until after the 27th day of June, 1916.   By its failure to persistently prosecute the work, it brought itself under the condemnation of the forfeiture clause in the contract to the effect that a failure on the part of

either party to comply with the provisions of the contract should terminate it.    We think on the 27th day of June, 1916, it could have been safely said that appellant company, under the record in this case, had abandoned the contract.    Where there has been an abandonment of contracts of this character, equity will cancel them.    *Mansfield Gas. Co.* v. *Alexander,* 97 Ark. 167; *Mansfield Gas Co.* v. *Parkhill,* 114 Ark. 419.    It is equally well settled, however, that equity will not enforce a forfeiture clause in a contract where the forfeiture has been waived.    "Any conduct on the part of one having the right to declare a forfeiture which is calculated to induce the other party to believe that a forfeiture is not to be insisted upon will be treated as a waiver."    *Wales-Riggs Plantations* v. *Banks,* 101 Ark. 461; *Ritter* v. *Thompson,* 102 Ark. 442.

On June 27, 1916, appellees wrote the following letter to the president of appellant company:

"R. A. Schmidt, Esq.:

"Dear Sir and Friend: I was down to Altus last week.    I saw Mr. McGraw; from the way he talked to me he is disgusted as regards the mine proposition on account of your high price on your holdings.    Said you asked him about $10,000 for your machinery without any coal lease.    Now, Mr. Schmidt, I am anxious for you to sell and come out on this proposition in good shape, and if will make your price right some one will buy you, but you need not expect to make any such sale as you ask Mr. McGraw, for there is no one who has ready cash to throw away.    You can well afford to take your part in stock in a new company or the company you sell out to, put it in at a very low value, for it will never be worth anything to you as it is running; you had really better put in at a very low figure than to lose all you have put in this mine.    Unless you show a willingness to sell out at a reasonable price, and get this mine started on a paying basis to you and all concerned, I am going to take steps at once to void the lease through court.    I want you to see Mr. McGraw and see if you can not get together; then if you can not sell to him at a bargain see Pendergrass.    I say

bargain because no one will buy your holdings there unless you sell at a bargain and a big one at that.

"They figure this way about it: They say you can never do anything with it, only run yourself further in debt and finally you will have to sell, and they or some one else will finally get at a sacrifice. So if you are going to have to make a sacrifice later why not do it now, and begin to get back something you have already lost in it? Now, as I said in the beginning, I want to give you a chance to do something, but unless you do something right away I shall proceed to void this lease. Let me hear from you by return mail your mind in the matter.

"Your friend,

"H. L. Hembree."

(2) We find in this letter a recognition of the existence of the lease on that date by appellees. They were not insisting upon an immediate forfeiture at that time on account of the breach of any covenant in the contract by appellant company. It called the attention of the company to the fact that it were better to sell at a low figure than to lose all it had put in the mine; advised that it sell to some one who could operate the mine, even though it be at a sacrifice, and threatened that unless it did something immediately in the way of developing and operating the mine itself, or by selling to some one who would do so, that they would take steps to void the lease. The entry to the mine was then full of water. Between the time the letter was written and the institution of this suit in November, 1916, a large sum was expended for equipment to operate the mine and same was placed upon the ground. Appellant company had arranged with Shipley and others to operate the leasehold on a division basis. The company was on the ground in October for the purpose of installing the new pumping machinery when Hembree and O'Kane made their appearance and an attempt was made between all the parties to place operations under the control of an experienced coal miner by the name of Shipley, but the negotiations failed. It is fairly deducible from the evidence that at the time this

suit was brought a *bona fide* effort was being made by appellant company to pump the water out of the mine for the purpose of beginning active operations under the lease. The activity on the part of appellant company was induced by the letter urging action and indicating that a forfeiture would not be insisted upon if the company would do something. After writing the letter, appellees were in no position to insist upon a change in the original lease or a forfeiture of it until appellant company should again breach some covenant in the contract. The evidence is wholly wanting to establish any breach on the part of appellants after it received Hembree's letter. We think Hembree's letter waives the right of appellees to enforce a forfeiture clause in the contract up to that time and that the letter and the conduct of appellants thereafter had the effect of continuing the lease, irrespective of former breaches on the part of appellant company. The right to enforce the forfeiture clause in the contract having been waived by appellees, it was error to cancel the lease.

The decree canceling the lease is therefore reversed and the cause is remanded with directions to dismiss the bill for want of equity.

HUMPHREYS, J., (on rehearing). (3) It is insisted by appellees on rehearing that Ollie Hembree and W. S. O'Kane were not bound by the letter written by H. L. Hembree to R. A. Schmidt of date June 27, 1916. It is true appellees were tenants in common of the real estate, but they made a joint contract or lease concerning same. They did not make separate or several contracts with reference to their separate interests in the real estate, but made a joint lease thereof, which placed them in the category of partners with reference to it. H. L. Hembree was acting clearly within the scope of his authority in writing the letter and bound his copartners in the lease. Hembree and O'Kane were both present in October, proposing that if they would give Mr. Shipley complete control and let him manage everything they would give him

sixty days to set a new pump, take the water out of the mine and reach the coal. This is proof conclusive down to the institution of the suit that Hembree and O'Kane were acting in concert concerning the lease. We think all the appellees were clearly bound by the act of either.

It is insisted that because the Shipley Coal Company were operating, or attempting to operate, the leasehold on a division basis, that it can not be said that the Schmidt-Blakely Coal Company were attempting to comply in good faith with the lease when this suit was instituted. It is disclosed in the letter of June 27, 1916, that the appellees wanted to give appellants in person, or through any one they might procure, by sale or otherwise, a chance to develop and operate the mine. In the letter Mr. Schmidt was urged to make a sale to McGraw, and if he could not do so to see Pendergrass.

It is insisted, however, that appellants were not making a *bona fide* effort to comply with the provisions of the lease after the date of the letter and at the time the suit was instituted. After rereading the evidence, we are convinced that appellants had made arrangements and were putting forth every effort to comply with the terms of the lease when suit was brought. There is nothing in the evidence from which it might be inferred that the efforts made after the date of the letter were made solely in an effort to mine the other property and not to mine the leasehold involved in this case. In other words, a rereading of the evidence has not convinced us that appellant company breached the covenant in the contract requiring it to operate the mine continuously and with vigor and due diligence after June 27, 1916.

For these reasons, the court declines to reopen the case.